UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED ALLOYS, INC., | No. CV 93-4722 CBM (Ex) |
| Plaintiff, | |
| v. | AMENDED FINDINGS OF FACT AND CONCLUSIONS OF LAW |
| HAROLD A. BAKER, et al., | |
| Defendants. | |

The matter before the Court, the Honorable Consuelo B. Marshall, United States District Judge presiding, is the bench trial held on Plaintiff and Counter-defendant United Alloys, Inc.'s ("United Alloys") claims for cost recovery and declaratory relief against Defendant and Counter-claimant Flask Chemical Corporation ("Flask"), and Flask's counterclaims for contribution against United Alloys, due to the contamination at United Alloys' property located at 900 East Slauson Avenue in Los Angeles, California. Upon consideration of the testimony and evidence received, and the Court's evaluation of the demeanor and credibility of the witnesses, the Court makes the following findings of fact and conclusions of

law pursuant to Federal Rule of Civil Procedure 52(a).[1]

## JURISDICTION

The Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1367, and 42 U.S.C. §§ 9607 and 9613(b).

## FINDINGS OF FACT

**A.    PROCEDURAL POSTURE OF THIS ACTION**

1.    On August 6, 1993, United Alloys filed the Complaint in this action pursuant to the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 ("CERCLA"), 42 U.S.C. § 9601 *et seq.*, the Resource Conservation and Recovery Act of 1976, 42 U.S.C. § 6901 *et seq.*, and other state laws. (Final Pretrial Conference Order at ¶ 40.)

2.    On October 20, 1993, Flask answered the Complaint and filed counterclaims for contribution and declaratory relief pursuant to 42 U.S.C. § 9613 and equitable indemnity and negligence against United Alloys. (*Id.* at ¶ 41.)

3.    In 1994, Flask filed bankruptcy. (*Id.* at ¶ 43.) In 1995, in order to lift the mandatory litigation stay imposed by Flask's bankruptcy, United Alloys and the bankruptcy trustee stipulated that United Alloys would release Flask from liability if United Alloys stipulated that it would limit any recovery to what might be obtained from claims against Flask's insurance carriers, Fireman's Fund Insurance Company ("Fireman's Fund") and Chubb Insurance Company ("Chubb"). (*Id.* at ¶ 44.)

4.    On January 13, 1997, the Court approved the settlements of Siskin Investment Company ("Siskin"), Harold A. Baker ("Baker"), and Harold A. Baker Metal Supply Company, Inc. (*Id.* at ¶ 46.) These settlements totaled

---

[1]    The Court's factual findings reflect facts that were proven at trial by a preponderance of the evidence. Although the Court cites to evidence to support each factual finding, such citations are not necessarily exhaustive. In numerous instances, additional portions of the record, which have not been cited by the Court, further corroborate the factual findings.

$290,000. (Flask Chemical Corp.'s Post-Trial Findings of Fact and Conclusions of Law at 50 [Doc. No. 301].) As part of the Order Confirming Good Faith Settlement, United Alloys was ordered to place all settlement proceeds in a separate, segregated account for the purpose of funding environmental remediation at the Property. (Final Pretrial Conference Order at ¶ 47.)

5.      United Alloys filed a Second Amended Complaint on June 2, 1998, in which it named Southern Pacific Transportation Company as a defendant in the action. [Doc. No. 105.]

6.      On April 11, 2001, United Alloys filed its Third Amended Complaint, in which it named BNSF Railway Company ("BNSF") as a defendant. [Doc. No. 125.] The Third Amended Complaint also named Union Pacific Railroad Company ("Union Pacific") as a defendant, and alleged that Union Pacific is the successor-in-interest to SPTC. [Doc. No. 125.]

7.      On March 26, 2010, the Court dismissed United Alloys' claim for relief under the Resource Conservation and Recovery Act of 1976, 42 U.S.C. § 6901 *et seq.*, for lack of subject matter jurisdiction. [Doc. No. 255.]

8.      The parties stipulated that United Alloys entered a settlement with BNSF and Union Pacific (collectively, "the Railroads") in the amount of $50,000 and a settlement with Chubb in the amount of $300,000. (4/21/10 2 Trial Tr. at 35.)

9.      United Alloys thereafter voluntarily dismissed its state common law causes of action, with the exception of its Carpenter-Presley-Tanner Hazardous Substance Account Act claim. [Doc. No. 262.] Flask also voluntarily dismissed its claims for equitable indemnity and negligence. [Doc. No. 261.]

10. At trial, the parties sought a judicial determination as to the extent and scope of the parties' liability for and contribution to contamination at United Alloys' property located at 900 East Slauson Avenue, Los Angeles, California. Thus, the Court must determine the liability of each party with respect to the contamination, the appropriate allocation of past costs incurred by United Alloys for site investigation and characterization, and whether declaratory relief is appropriate.

11. In the Final Pretrial Conference Order, the parties stipulated to sixty-three (63) facts, all of which are incorporated into the Court's Findings of Fact and Conclusions of Law. [Doc. No. 291.]

12. The Court heard live testimony from three lay witnesses and three expert witnesses. Mr. Timothy Wood ("Wood"), who testified as an expert witness on behalf of United Alloys, rendered opinions regarding the source and nature of the contamination at the Property, the impact of the contamination on soil and groundwater beneath the Property, the need for remediation, and the proper apportionment of liability. Mr. Ulf Lindmark ("Lindmark"), an expert witness on behalf of Flask, testified as to the source and extent of subsurface contamination of volatile organic compounds ("VOCs"). Mr. James T. Wells ("Wells"), who also testified as an expert witness on behalf of Flask, served as a rebuttal expert witness to Wood. The Court also received into evidence the deposition testimony of three lay witnesses and hundreds of exhibits.

**B.      BACKGROUND OF THE OWNERSHIP OF THE PROPERTY**

13. The dispute concerns real property located at 900 East Slauson Avenue, Los Angeles, California ("the Property"). (Final Pretrial Conference Order at ¶ 1.[2]) The Property is three hundred sixty-seven (367)

---

[2] The numbers referenced in this Court's Findings of Fact and Conclusions of Law refer to the stipulated facts which begin on page three (3) and end on page ten (10) of the Final Pretrial Conference Order. [Doc. No. 291.]

feet long and two hundred (200) feet wide. (*Id.* at ¶ 2.) A building ("the Main Building") occupies approximately half of the Property, which is located in a heavy industrial and commercial manufacturing area. (Exs. 205, 406[3].)

14.     The Property was owned by Goodyear Tire and Rubber from 1920 to 1928. (Final Pretrial Conference Order at ¶ 1.)

15.     In 1924, the Atchison Topeka and Santa Fe Railway Company and the Pacific Electric Railway Company entered into a contract for industry track enabling them to operate in what became the railroad right-of-way on the southern border of the Property. (*Id.* at ¶ 3.) The railroad right-of-way was a forty-six (46) foot wide easement, half of which occupied the southernmost twenty-three (23) feet of the Property. (*Id.* at ¶ 4.)

16.     The Property was owned by several different investment companies, including Siskin, from 1929 to 1970. (*Id.* at ¶ 5.)

17.     Reese Chemical Company ("Reese") began leasing and operating a chemical distribution facility at the Property in 1969. (*Id.* at ¶ 6.)

18.     Baker purchased the Property from Siskin in 1970. (*Id.* at ¶ 7.)

19.     In November 1972, Flask assumed Reese's lease and operated a chemical distribution facility at the Property until January 1979. (*Id.* at ¶ 8; Ex. 418.) By January 1979, Flask had ceased operations at the Property. (Final Pretrial Conference Order at ¶ 21.)

20.     On January 3, 1979, Baker sold the Property to United Alloys. (*Id.* at ¶ 20; 4/20/10 Trial Tr. (Donn, R.) at 38; Ex. 420.)

21.     In 1995, the Railroads and/or their corporate successors-in-interest filed a Certificate of Abandonment for the tracks in the railroad right-of-way. (Final Pretrial Conference Order at ¶ 45.) Since that time, United

---

[3]     Exhibit 406 and Exhibit 201 are both the Green Environmental Phase I site assessment but Exhibit 406 includes appendices.

Alloys has maintained an exclusive possessory right in the former railroad right-of-way. (*Id.*)

22.     In 2002, United Alloys was purchased by Cronimet Corporation ("Cronimet") along with all of the equipment on the Property owned by United Alloys. (*Id.* at ¶ 50.) United Alloys continues to own the Property but leases it to Cronimet. (*Id.* at ¶¶ 51, 62; 4/20/10 Trial Tr. (Donn, R.) at 35, 38.) The business has remained essentially the same, but the name was changed to United Alloys and Metals, Inc. (Final Pretrial Conference Order at ¶ 52.) United Alloys and Metals, Inc. continues to operate at the Property. (*Id.* at ¶ 61.)

## C. FLASK'S OPERATIONS AT THE PROPERTY: 1972 TO 1979

23.     During its operations from 1972 to 1979, Flask conducted chemical storage, processing, sales, and distribution at the Property. (*Id.* at ¶¶ 8, 9.) Beginning in 1972, Robert Heisler ("Heisler") served as Flask's operations manager. (*Id.* at ¶ 15.)

24.     The Main Building, which was used as a warehouse and operations building, was situated on the eastern half of the Property during Flask's tenancy. (Exs. 310, 445.)

25.     In the northwestern area of the Property, Flask used a ten-thousand (10,000) gallon gasoline tank. (Ex. 310.)

26.     In the southwestern area of the Property, Flask used four (4) above-ground storage tanks ("AST(s)") to store chlorinated solvents, including perchlorethylene ("PCE") and trichloroethene ("TCE"). (Final Pretrial Conference Order at ¶ 10; Exs. 310, 445.) Three (3) of these ASTs held twenty thousand (20,000) gallons and one (1) AST held ten thousand (10,000) gallons. (Final Pretrial Conference Order at ¶ 10; Ex. 310.)

27.     The ASTs were situated on concrete pads, and surrounded by gravel and a retaining wall. (4/23/10 Trial Tr. (Wood, T.) at 160.) The concrete

pad served as a support structure for the ASTs, the gravel allowed for infiltration of spills, and the retaining wall enabled spills to be restricted to a predetermined area. (*Id.* at 160-61.)

28.     To the north of the AST area, Flask used eighteen (18), five thousand (5,000) gallon underground storage tanks ("UST(s)") to store flammable material including alcohol, acetone, naptha, and methyl ethyl ketone. (Final Pretrial Conference Order at ¶ 11; Deposition of Robert Heisler ("Heisler Dep.") at 23; Ex. 310.) The UST area of the Property was approximately two thousand four hundred seventy-five (2,475) square feet. (Final Pretrial Conference Order at ¶ 12.)

29.     The ASTs and the USTs were separated by a concrete apron, approximately thirty-five (35) feet long. (*Id.* at ¶ 13.) The concrete apron contained a two thousand (2,000) gallon blending tank, a filling machine for small containers, pumps, a scale, and a conveyor. (*Id.* at ¶ 14; 4/23/10 Trial Tr. (Wells, J.) at 25; Ex. 310.)

30.     There was also a clarifier located in the area between the ASTs and the USTs. (Final Pretrial Conference Order at ¶ 22; 4/22/10 Trial Tr. (Lindmark, U.) at 113.) The clarifier is a multi-compartment concrete structure designed to separate oil from water. (4/22/10 Trial Tr. (Lindmark, U.) at 22-23.) It served as a treatment method for wastewater. (*Id.* at 23.) Flask used the clarifier for a neutralization system for acids that were discharged into the sewer, not for chlorinated solvents. (4/23/10 Trial Tr. (Lindmark, U.) at 84.)

31.     Flask mixed, blended, and containerized chlorinated solvents in the areas between the ASTs and USTs and north of the USTs. (4/22/10 Trial Tr. (Lindmark, U.) at 113; 4/23/10 Trial Tr. (Wells, J.) at 14-15, 23-24; Ex. 310.) At this location, it also used pumps to fill the tanks or tanker trucks that arrived with deliveries. (4/22/10 Trial Tr. (Lindmark, U.) at 113;

4/23/10 Trial Tr. (Wells, J.) at 14-15, 23-24; Ex. 310.)

32.     On the southern border of the Property, Flask received chemical and solvent shipments from railcars via the railroad spur. (Final Pretrial Conference Order at ¶ 16; Exs. 310, 445.) Railcars delivered chlorinated solvents, such as PCE, TCE, and methylene chloride. (Heisler Dep. at 25, 60, 65-66, 71-74.) The metal rails were situated on railroad ties. (*Id.* at 54-55.) Dirt covered the area under and around the metal rails. (*Id.* at 55.)

33.     Flask's employees were responsible for offloading chemicals from the railcars on the railroad spur and transporting the chemicals onto the Property. (Final Pretrial Conference Order at ¶ 18; Heisler Dep. at 22.) Neither Heisler nor other Flask employees had specific instructions, knowledge, or training as to how to unload the chemicals from these railcars. (Heisler Dep. at 104-05.)

34.     Flask's employees were also responsible for unloading chemical and solvent shipments delivered to the Property by tanker trucks. (Final Pretrial Conference Order at ¶ 16; Heisler Dep. at 22-23.) Occasionally, chemicals were put into drums directly from the trucks because Flask did not have sufficient storage to accommodate the deliveries. (Heisler Dep. at 23; Ex. 445.) The drums were stored along the western side of the Main Building. (Ex. 445.)

35.     During Flask's operations on the Property, there were accidental spills. (Final Pretrial Conference Order at ¶ 17.)

36.     Specifically, there were four accidental spills of chemicals delivered to the Property by railcars. (*Id.* at ¶ 19; Heisler Dep. at 60, 65-66, 71-74.) In the first incident, approximately two (2) to five (5) gallons of PCE spilled when Flask's employees tried to open the railcar to transfer the PCE onto the Property. (Heisler Dep. at 60.) In two (2) other incidents, Flask's employees caused approximately five (5) to ten (10) gallons of PCE to be

8

spilled during the disconnection of a hose attached between a pump and the railcar. (*Id*. at 65-66, 73-74.) In the final incident, Flask employees caused approximately five (5) to ten (10) gallons of methylene chloride to be spilled while disconnecting the hose attached between a pump and the railcar. (*Id*. at 71-73.) During these incidents, the chemicals spilled onto unpaved ground and Flask made no effort to clean up the spills. (*Id*. at 63, 66-67, 72.) These incidents were also not reported to any agency or entity. (*Id*. at 63, 67, 73-74.)

37.    There were also chlorinated solvent spills during the period in which Flask employees were learning how to transfer chemicals from the tanker trucks to Flask's chemical containers. (*Id*. at 59-60.)

38.    On other occasions, forklifts punctured drums of chemicals causing spills of approximately twenty (20) gallons of chemicals on each occasion inside of the facility. (*Id*. at 56-57.)

39.    Finally, on another occasion, a vandal opened the valves on an AST containing PCE that resulted in a spill of five hundred (500) gallons. (*Id*. at 79-80.)

40.    By January 1979, Flask had ceased operations at the Property. (Final Pretrial Conference Order at ¶ 21.) In or around January 1979, it removed the ASTs from the Property and took them to its next place of business. (*Id*. at ¶ 25.)

**D.    UNITED ALLOYS OPERATIONS AT THE PROPERTY: 1979 TO PRESENT**

41.    On January 3, 1979, Baker sold the Property to United Alloys. (*Id*. at ¶ 20; 4/20/10 Trial Tr. (Donn, R.) at 38; Ex. 420.) In 1980, United Alloys was owned by Mr. Ron Donn ("Donn"), Mr. Allan Sacks, and Mr. Arthur Sacks. (Final Pretrial Conference Order at ¶ 27; 4/20/10 Trial Tr. (Donn, R.) at 55.)

42.     United Alloys used the Property for a scrap metal recycling and refurbishing business. (Final Pretrial Conference Order at ¶ 26.) Site activities included receiving, sorting, stripping, crushing, processing, and re-selling high-grade alloy metals, such as zirconium, nickel, titanium, cobalt, and copper. (Exs. 207[4], 671[5].)

43.     At the time of the sale of the Property from Baker to United Alloys, the Property consisted of the Main Building and a work yard ("the Yard") occupying the western half of the Property. (Final Pretrial Conference Order at ¶ 24.)

44.     There was also one clarifier, which was located in the southern portion of the Property between the AST area and UST area. (*Id.* at ¶ 22; Ex. 312.) The southern clarifier is connected to the sewer main running under the former railroad right-of-way. (Final Pretrial Conference Order at ¶ 23.)

45.     Following United Alloys' purchase of the Property, United Alloys made numerous changes to the Property, including the removal, in 1980, of the eighteen (18) USTs used by Flask during its tenancy. (*Id.* at ¶ 28; 6/2/10 Trial Tr. (Wood, T.) at 6; Ex. 410.) During the excavation of the USTs, there were no indications of soil saturation or vapors emanating from the soil. (Deposition of Darron H. Evans ("Evans Dep.") at 27-28, 30, 46.) However, the native soil was not tested for the presence or absence of contaminants. (*Id.* at 42; 4/22/10 Trial Tr. (Lindmark, U.) at 142; 6/2/10 Trial Tr. (Lindmark, U.) at 171.) Likewise, the import fill did not emit any strange odors but no samples were taken of the import soil used in connection with the soil excavation. (Evans Dep. at 36-37; 4/23/10 Trial Tr. (Wells, J.) at 38; 6/2/10 Trial Tr. (Lindmark, U.) at 171-72.)

---

[4] Exhibit 207 and Exhibit 449 are the Remedial Action Plan but Exhibit 449 includes appendices.
[5] Exhibit 671 and Exhibit 226 are the identical Voluntary Cleanup Agreement.

46.     In 1980, a degreasing system was installed inside of the Main Building. (Final Pretrial Conference Order at ¶ 29; Ex. 312.) A one thousand (1,000) gallon PCE storage tank was connected to the degreasing system. (Final Pretrial Conference Order at ¶ 30; Ex. 312.) From 1980 to 1997, PCE was used to clean certain metals and strip off any impurities that had formed on the metal. (Final Pretrial Conference Order at ¶ 31; Exs. 439, 671.) There was a spill in the degreasing room. (4/21/10 2 Trial Tr. (Lindmark, U.) at 48; 4/22/10 Trial Tr. (Lindmark, U.) at 114-15, 118.)

47.     The purchasing records from 1982 through 1984 demonstrate that United Alloys purchased between two thousand seven hundred (2,700) gallons and approximately seven thousand seven hundred (7,700) gallons of PCE. (6/2/10 Trial Tr. (Wood, T.) at 32; Ex. 438.) United Alloys' permit with the South Coast Air Quality Management District limited emissions of PCE to eight thousand (8,000) gallons of use per year. (6/2/10 Trial Tr. (Wood, T.) at 32-33.)

48.     On April 13, 1984, there was a spill at the Property when a third party attempted to deliver TCE to United Alloys. (4/21/10 2 Trial Tr. (Lindmark, U.) at 54; Ex. 250.) A 55-gallon drum of TCE spilled into the storm drain catch basin on Slauson Avenue. (4/23/10 Trial Tr. (Wood, T.) at 163-65; Ex. 250.) The catch basin, which was clogged, prevented any waste from reaching the flood control channel. (4/23/10 Trial Tr. (Wood, T.) at 165; Ex. 250.)

49.     Until 1990, United Alloys used a ten thousand (10,000) gallon underground tank to store gasoline for its trucks. (Final Pretrial Conference Order at ¶ 32.) The gasoline tank was located in the northern area of the Property, roughly thirty-five (35) feet from the northern property line. (*Id.* at ¶ 33.) United Alloys removed this gasoline tank in 1990. (*Id.* at ¶ 34; Ex. 409.) There was no evidence of leakage or spillage during the removal.

(Ex. 409.)

50.     In 1990, United Alloys installed a clarifier in the northern portion of the Property as part of a storm water system. (Final Pretrial Conference Order at ¶ 35; Ex. 312.) It is located approximately twenty (20) feet from the northern border of the Property. (Final Pretrial Conference Order at ¶ 35.)

51.     United Alloys' operations caused sludge waste to collect in the clarifiers and the degreaser. (Deposition of Arthur Castellanos ("Castellanos Dep.") at 18-19; 4/23/10 Trial Tr. (Wells, J.) at 68; 6/2/10 Trial Tr. (Wood, T.) at 16.) Sludge is the viscous mixture of grease and PCE, and perhaps even metal filings, left behind due to the cleaning of metal parts, which are often oily or greasy. (4/23/10 Trial Tr. (Wells, J.) at 69; 6/2/10 Trial Tr. (Wood, T.) at 35.)

52.     Sludge from the clarifiers and the degreaser was packed into 55-gallon drums and stored on the Property outside of the Main Building, and south of the degreasing room. (Castellanos Dep. at 50-51, Ex. 9.) The sludge was removed, tested, and manifested for offsite disposal every ninety (90) days as required by law. (4/23/10 Trial Tr. (Simpson, T.) at 113-14; 6/2/10 Trial Tr. (Wood, T.) at 16-17.) Laboratory reports from 1991 to 1992 indicated that PCE was found in the clarifiers and the degreaser. (Castellanos Dep. at 12, 16-19, 28, 34, 51-54, 56-57; 4/22/10 Trial Tr. (Lindmark, U.) at 9-18; Exs. 242-47.)

53.     United Alloys emitted approximately one hundred eight thousand five hundred twelve (108,512) pounds per year of PCE into the atmosphere through the degreaser. (4/23/10 Trial Tr. (Wells, J.) at 67-68; Ex. 301[6].) Another four thousand two hundred (4,200) pounds per year of PCE were

---

[6]     Exhibit 301 and Exhibit 239 are excerpts from a longer Simon Health Risk Assessment report. Portions of Exhibit 239, however, are highlighted. Exhibit 411 is the full Simon Health Risk Assessment report.

lost to adsorption onto the metal shavings cleaned through the degreasing process. (4/23/10 Trial Tr. (Wells, J.) at 68-69; Ex. 301.)

54.    United Alloys used no more than eight thousand (8,000) gallons of PCE per year until 1997. (Final Pretrial Conference Order at ¶ 31; 4/22/10 Trial Tr. (Wells, J.) at 172-73.)

55.    Vapor emissions of PCE from the storage tank, degreaser, and adsorber were approved by the South Coast Air Quality Management District. (4/23/10 Trial Tr. (Wells, J.) at 14; Ex. 439.)

**E.    ENVIRONMENTAL SITE INVESTIGATION AND REGULATORY OVERSIGHT AT THE PROPERTY**

56.    In 1992, Donn, the then-owner of United Alloys, came to suspect that the Property may be contaminated after attending institute meetings concerning the possible contamination of sites operated by chemical companies. (4/20/10 Trial Tr. (Donn, R.) at 35, 38.)

57.    That same year, Green Environmental, Inc. ("Green Environmental") performed a Phase I site assessment of the Property. (*Id*. at 40; Final Pretrial Conference Order at ¶ 36; Ex. 406.) Green Environmental's investigation found PCE and TCE contamination in the soil at multiple locations throughout the Property. (Final Pretrial Conference Order at ¶ 37; Ex. 406.) Green Environmental identified the onsite handling of metals, the previous onsite storage and control of hydrocarbons, and hazardous material problems in the immediate vicinity as causes for concern. (Ex. 406.) Green Environmental recommended that an additional investigation be conducted at the Property. (Final Pretrial Conference Order at ¶ 38.)

58.    The following year, in 1993, Western Environmental Engineering Company ("WEECO") performed a Phase II investigation at the Property, taking numerous soil samples under the Main Building and in the Yard. (*Id*.

at ¶ 39; 4/20/10 Trial Tr. (Donn, R.) at 41-42; Ex. 407[7].) WEECO drilled twenty-two (22) exploratory borings to depths between ten (10) and twenty-two (22) feet below ground surface. (Ex. 407.) WEECO concluded that the contamination of PCE and TCE was from a common source. (*Id.*) WEECO further concluded that there appeared to have been a release of solvents in the southwestern corner of the Property, which served as the AST area and UST area during Flask's tenancy. (*Id.*; *see* Findings of Fact Nos. 26, 28) WEECO recommended that further exploration be performed at the Property through the installation, sampling, and analysis of additional borings. (Ex. 407)

59.     Shortly after the WEECO report was published, the fire department was notified of the contamination at the Property. (4/23/10 Trial Tr. (Simpson, T.) at 108, 119.)

60.     In 1994, AMEC Geomatrix, Inc. ("Geomatrix") was hired to investigate the vertical and lateral extent of contamination at the Property and whether groundwater had been impacted. (Final Pretrial Conference Order at ¶ 42; 4/20/10 Trial Tr. (Donn, R.) at 43; 4/20/10 Trial Tr. (Simpson, T.) at 155; 4/23/10 Trial Tr. (Simpson, T.) at 107.) Mr. Timothy Simpson ("Simpson") has been the principal in charge of the United Alloys project since 1994. (4/20/10 Trial Tr. (Simpson, T.) at 155.)

61.     Geomatrix conducted additional soil and soil gas sampling and analysis to better understand site conditions and the source of the contamination. (*Id.* at 156.)

62.     On October 1, 1999, Geomatrix submitted its Subsurface Assessment Report to the California Regional Water Quality Control Board ("Regional Board"). (*Id.*; Final Pretrial Conference Order at ¶ 48; Ex. 569.) The report presented the findings from exploratory drilling, soil sampling, soil gas

---

[7]     Exhibit 407 and Exhibit 202 are the WEECO Phase II investigation but Exhibit 407 includes appendices.

sampling, monitoring well installation, and groundwater sampling. (Ex. 569.) PCE and TCE were detected in soil, soil gas, and groundwater samples. (*Id.*)

63.    As a result of the 1999 report, United Alloys became part of the Regional Board's Spills, Leaks, Investigations and Cleanups ("SLIC") Program, wherein the Regional Board appointed a project manager and United Alloys was required to pay oversight fees through a fee-for-service agreement. (4/20/10 Trial Tr. (Donn, R.) at 44-45; 4/20/10 Trial Tr. (Simpson, T.) at 157-58; Exs. 206, 432.)

64.    Additional groundwater monitoring wells were installed throughout the Property. (Ex. 203.) Groundwater monitoring wells are necessary for several reasons, such as determining whether: (1) the site is affecting groundwater; (2) there is a regional contamination issue; and (3) certain remedies are effective. (4/22/10 Trial Tr. (Lindmark, U.) at 96-97.)

65.    The Regional Board also instructed Geomatrix to install additional soil borings. (Ex. 203.)

66.    Geomatrix submitted a 2002 Data Transmittal Summary Assessment Work Plan to the Regional Board which explained that there were significant releases of chlorinated solvents in the southwestern corner of the Property, the location of the ASTs and USTs during Flask's tenancy. (4/20/10 Trial Tr. (Simpson, T.) at 158-59.)

67.    Thereafter, the Regional Board directed Geomatrix to install downgradient wells to the north of the Property. (*Id.* at 160, 163.) The 2004 Offsite Monitoring Well Installation Report described the analysis of offsite monitoring wells installed to delineate the extent of the groundwater plume underneath the Property. (*Id.* at 159-61; Ex. 575.)

68.    The Regional Board required Geomatrix to collect samples from all monitoring wells and report the results to the Regional Board on a quarterly

basis. (4/20/10 Trial Tr. (Simpson, T.) at 160-61.) In the 2005 First

Quarter Groundwater Monitoring Report, in particular, Geomatrix found

that groundwater moved from south to north, almost perpendicular to

Slauson Avenue. (*Id*. at 162.) It also found that groundwater moved rather

slowly and that VOCs in groundwater were moving offsite. (*Id*.)

69.     The Regional Board thereafter required that Geomatrix install

upgradient monitoring wells. (*Id*. at 162-63.) Geomatrix concluded that the

first two upgradient wells, which were installed in the southern portion on

the Property, were too close to the southwestern corner, the location of the

ASTs and USTs during Flask's tenancy. (*Id*. at 163.) Geomatrix therefore

installed an additional upgradient monitoring well on an adjacent

landowner's property. (*Id*.) The first analysis of samples taken from this

monitoring well indicated fairly low concentrations of PCE and TCE. (*Id*.

at 164.) However, Geomatrix collected only one groundwater sample from

this monitoring well, on November 15, 2000, because United Alloys lost

access to the well due to a dispute with the property owner. (4/21/10 1 Trial

Tr. (Simpson, T.) at 32-33.) There was an increase in both PCE and TCE in

a sample collected on December 21, 2009. (*Id*. at 44-45, 49; Ex. 216.)

Thus, the upgradient monitoring well reflected higher concentrations of

contamination than the downgradient monitoring wells that Geomatrix

tested at the same depth. (*Id*. at 46-47.)

70.     On June 2, 2005, Geomatrix submitted its Conceptual Remedial

Action Work Plan, which addressed groundwater quality and soil

remediation, to the Regional Board. (Final Pretrial Conference Order at ¶

53; Ex. 205[8].) Site groundwater was predominantly impacted by PCE and

TCE with lower concentrations of VOCs also present in groundwater

---

[8]     Exhibit 205 and Exhibit 448 are the Conceptual Remedial Action Work Plan but Exhibit 448 includes attachments.

samples collected from onsite monitoring wells. (Ex. 205.) Attenuation of PCE and TCE appeared to be occurring with distance but significant biodegradation of PCE and TCE was not occurring in the groundwater at the Property. (*Id.*) Geomatrix proposed the use of the bio-augmentation method, which consisted of the addition of a carbon substrate and nutrient amendments, to remediate groundwater containing VOCs after performing a bench-scale study followed by a pilot-scale study. (*Id.*)

71.    With respect to soil remediation, Geomatrix proposed the use of the soil vapor extraction method, the EPA presumptive remedy. (*Id.*) Soil vapor extraction "is implemented by applying a vacuum using a vacuum blower to extraction wells screened in the vadose (or unsaturated) zone where VOCs are present in soil and soil vapor. The vacuum causes VOCs in soil to be volatilized from soil and the VOC-laden vapor to be drawn to the extraction wells, where the vapors are collected and conveyed to the surface by the vacuum blower. The VOC-laden vapor is then treated to remove the VOCs prior to venting the treated vapor to the atmosphere." (*Id.*)

72.    The purpose of the Conceptual Remedial Action Plan was to provide an estimate regarding the cleanup of the site, including soil and groundwater remediation, and eliminate a very expensive pump-and-treat system as a potential remedy. (4/20/10 Trial Tr. (Simpson, T.) at 164-65.) The Regional Board suggested that Geomatrix investigate the bio-augmentation approach identified in the Conceptual Remedial Action Plan. (4/21/10 1 Trial Tr. (Simpson, T.) at 16.)

73.    On July 19, 2005, the Regional Board sent a letter to United Alloys stating that it concurred with the Conceptual Remedial Action Work Plan and that a subsequent Remedial Action Plan must be submitted to the Regional Board staff for approval. (Ex. 206.) It also instructed United

1    Alloys to refrain from initiating any field work until the Regional Board

2    approved the complete Remedial Action Plan for the Property.  (*Id.*)

3    74.    On September 20, 2005, Geomatrix sent its Remedial Action Plan

4    ("RAP") for the Property to the Regional Board.  (Final Pretrial Conference

5    Order at ¶ 54; Ex. 207.)  The predominant VOCs detected in soil gas, soil,

6    and groundwater samples were PCE and TCE.  (Ex. 207.)  The RAP

7    proposed a two-fold approach for remediation of VOCs at the Property: (1)

8    removal of source area VOCs from the vadose zone using soil vapor

9    extraction; and (2) degradation of VOC mass in the groundwater using bio-

10   augmentation.  (*Id.*)  The RAP also provided that a soil vapor extraction

11   pilot study and bio-augmentation studies were to be conducted at the

12   Property.  (*Id.*)  Geomatrix did not include any data from the 1993 report

13   conducted by WEECO because it did not reflect a comprehensive

14   investigation.  (4/21/10 1 Trial Tr. (Simpson, T.) at 25.)  Upon request, it

15   disclosed the WEECO data to the requesting public agency, either the

16   Regional Board or the DTSC.  (*Id.* at 25-26.)

17   75.    On August 16, 2006, Geomatrix sent its Responses to Remedial

18   Action Work Plan Review Letter and Site Assessment Work Plan to the

19   Regional Board.  (Final Pretrial Conference Order at ¶ 55; Ex. 208.)  The

20   letter provided Geomatrix's responses to the Regional Board staff's

21   comments and questions.  (Ex. 208.)  Among other things, the Regional

22   Board sought further information regarding soil gas and soil samples, a

23   comprehensive groundwater investigation to determine the extent of the

24   contaminant plume beneath the Property, and additional information

25   regarding the soil vapor extraction pilot study.  (*Id.*)  The Regional Board

26   also approved the bio-augmentation pilot study for groundwater beneath the

27   Property.  (*Id.*)

28   76.    On October 19, 2006, regulatory oversight was transferred from the

Regional Board to the California Department of Toxic Substance Control ("DTSC"). (Final Pretrial Conference Order at ¶ 56; 4/20/10 Trial Tr. (Krug, R.) at 114.)

77. Robert Krug ("Krug"), a Hazardous Substances Scientist for the DTSC, is the project manager for the Property. (4/20/10 Trial Tr. at (Krug, R.) at 113-14.)

78. The DTSC's role is to oversee site investigation and remediation. (4/20/10 Trial Tr. at (Krug, R.) at 115, Ex. 671.) The DTSC needed to review previous reports to make an evaluation and determination as to the characterization of the contamination at the Property. (4/20/10 Trial Tr. at (Krug, R.) at 120.)

79. Therefore, Geomatrix resubmitted its prior reports to the DTSC, which were reviewed by Krug. (*Id.* at 119-20; 4/20/10 Trial Tr. (Simpson, T.) at 168-69.)

80. In January 2007, United Alloys entered into a Voluntary Cleanup Agreement ("VCA") with the DTSC. (Final Pretrial Conference Order at ¶ 57; 4/20/10 Trial Tr. at (Krug, R.) at 114; Ex. 671.) The VCA explained that reports indicated that the soil and groundwater at the Property were contaminated with hazardous substances, including PCE and TCE. (Ex. 671.) The VCA set forth the following objectives: (1) United Alloys must implement the RAP under the oversight of the DTSC; (2) the DTSC must determine what additional work, if any, would be required to complete the investigation of the Property; and (3) the DTSC must obtain reimbursement from United Alloys for the DTSC's oversight costs. (*Id.*) The VCA further provided that the DTSC shall review and oversee the response activities conducted by United Alloys and all work shall be performed consistent with Health and Safety Code Section 25300 *et seq.*, the National Contingency Plan, the United States Environmental Protection Agency and the DTSC

19

Superfund guidance documents regarding site investigation and remediation. (*Id.*)

81.     Since approximately 2005, United Alloys has also worked with Mr. Ron Hayes from Compliance Administrators and Project Services ("CAPS"), who provides technical guidance and assistance with respect to the site investigation of the Property. (4/20/10 Trial Tr. (Donn, R.) at 50.)

82.     On July 6, 2007, Geomatrix sent its Revised Site Assessment Work Plan to the DTSC enumerating the activities proposed in the original Site Assessment Work Plan dated August 16, 2006, and revisions in accordance with comments provided by the DTSC, which were required for approval of the activities proposed in the original Site Assessment Work Plan. (Final Pretrial Conference Order at ¶ 58; Ex. 455.)

83.     On September 21, 2007, Alice Campbell ("Campbell"), Senior Engineering Geologist of DTSC, sent a memorandum to Krug regarding the July 6, 2007 Revised Site Assessment Work Plan. (4/20 Trial. Tr. (Donn, R.) at 89-90; Ex. 209[9].)  Campbell concluded that (1) the soil gas, soil matrix, and groundwater data had features indicating at least two different sources of contamination in soil and groundwater; (2) some VOC contamination in groundwater may be part of a larger local or regional plume; and (3) the proposed Work Plan was acceptable provided that Geomatrix respond to the comments addressed in the memorandum. (Ex. 209.)

84.     On September 21, 2007, the DTSC approved the Site Assessment Work Plan and provided comments to be addressed prior to the initiation of the soil vapor extraction pilot study. (Ex. 210.)

85.     On March 31, 2008, Geomatrix sent its Revised Site Assessment

---

[9]     Exhibit 209 and Exhibit 294 are the same memorandum from Campbell.  Portions of Exhibit 294, however, are highlighted and Exhibit 209 has an additional page.

20

Work Plan to the DTSC. (Final Pretrial Conference Order at ¶ 59; Ex. 456.) The Revised Site Assessment Work Plan was based on the July 6, 2007 Site Assessment Work Plan, which was updated in accordance with the DTSC's comments and Geomatrix's responses. (Ex. 456.)

86. On February 22, 2010, Geomatrix sent its Additional Site Assessment and Extended Soil Vapor Extraction Pilot Study Report to the DTSC. (Final Pretrial Conference Order at ¶ 60; Ex. 442.) The report summarized the data collection efforts of the extended pilot study. (4/20/10 Trial Tr. (Simpson, T.) at 171-73; Ex. 442.) It demonstrated that soil vapor extraction was a feasible remedy for the Property. (4/20/10 Trial Tr. (Simpson, T.) at 172.)

87. The work performed by Geomatrix at the Property was conducted at the direction of the Regional Board and the DTSC. (*Id.* at 173.) The DTSC relied on reports conducted prior to the involvement of these public agencies to characterize the site contamination. (4/20/10 Trial Tr. (Krug, R.) at 120.)

88. The work performed on the Property has been compliant with the national contingency plan. (*Id.* at 120-21; 4/20/10 Trial Tr. (Simpson, T.) at 174.)

89. The parties stipulated that "the DTSC will, for certain, require the following cleanup actions: (1) additional site investigation, including installation of additional groundwater wells; (2) remediation. The soil vapor extraction system is a presumptive remedy; (3) continued quarterly groundwater monitoring to evaluate the effectiveness of the soil vapor extraction remedy." (Final Pretrial Conference Order at ¶ 63.)

## F.    RESPONSE COSTS INCURRED TO DATE

90. United Alloys paid Green Environmental the amount of $4,075 for work performed in connection with the Phase I site assessment of the

Property. (4/20/10 Trial Tr. (Donn, J.) at 40-41; Exs. 408, 426.)

91.    United Alloys paid WEECO the amount of $24,100 for work performed in connection with the Phase II investigation at the Property. (4/20/10 Trial Tr. (Donn, R.) at 42; Exs. 426-29.)

92.    United Alloys paid Geomatrix the amount of $232,981.09 for work conducted at the Property through 2002. (4/20/10 Trial Tr. (Donn, R.) at 43; Ex. 430; United Alloys, Inc. Trial Br. at 11-15 [Doc. No. 271].)

93.    In 2002 and thereafter, United Alloys' insurers, Fireman's Fund Insurance Company and Chubb Insurance Company, assumed responsibility for payment for Geomatrix's services.[10] (4/20/10 Trial Tr. (Donn, R.) at 43-44; Ex. 430.) United Alloys' insurers paid $1,283,722.81 directly to Geomatrix for its services. (4/20/10 Trial Tr. (Donn, R.) at 43-44; Ex. 430; United Alloys, Inc. Trial Br. at 14-15[Doc. No. 271].)

94.    United Alloys paid the Regional Board the amount of $6,376.34 for its regulatory oversight of the Property for the period from 2000 to 2007. (4/20/10 Trial Tr. (Donn, R.) at 45-47; Ex. 432.) Due to a dispute with the Regional Board, certain outstanding invoices have not been paid. (4/20/10 Trial Tr. (Donn, R.) at 47.) United Alloys owes the Regional Board an additional amount of $21,414.58 for its regulatory oversight of the Property. (Ex. 432.)

95.    United Alloys paid a fifty percent (50%) deposit, which amounted to $25,695.00, to the DTSC for its regulatory oversight of the Property. (4/20/10 Trial Tr. (Donn, R.) at 48-49; Ex. 671.)

96.    The total amount of the invoices from the DTSC to United Alloys is $54,631.79. (Ex. 433.) United Alloys has at least one outstanding invoice owed to the DTSC. (4/20/10 Trial Tr. (Donn, R.) at 49.) The DTSC

---

[10]    Each party had its own insurance policies with Fireman's Fund Insurance Company and Chubb Insurance Company.

continues to incur oversight costs in connection with this matter. (4/20/10 Trial Tr. (Krug, R.) at 117.)

97.    United Alloys paid CAPS the amount of $102,063.82 for its consultant work. (4/20/10 Trial Tr. (Donn, R.) at 50-51; Ex. 431.)

**G.    SUBSURFACE LITHOLOGY OF THE PROPERTY**

98.    There is a 35- to 40-foot lens -- the fine grain layer -- impeding the vertical migration of contaminants. (4/20/10 Trial Tr. (Krug, R.) at 137-38; 4/23/10 Trial Tr. (Simpson, T.) at 133; Exs. 205, 212, 326.) The thickness of the fine grain layer varies across the Property. (4/22/10 Trial Tr. (Lindmark, U.) at 32; Exs. 212, 326.) In the northern portion of the Property, the thickness of the fine grain layer is approximately twenty (20) feet whereas in the southern portion of the Property, it is less than ten (10) feet. (4/22/10 Trial Tr. (Lindmark, U.) at 32; Exs. 212, 326.)

99.    The soils above this fine grain layer generally consist of sandy soils. (4/22/10 Trial Tr. (Lindmark, U.) at 33.) Contaminants generally travel vertically, not laterally, through the sandy soils. (*Id.*; 4/22/10 Trial Tr. (Wells, J.) at 178.) Because the fine grain layer has a much greater density, it prevents contaminants from continuing to migrate vertically in the same way that such contaminants migrate through sandy soils. (4/22/10 Trial Tr. (Lindmark, U.) at 65; 4/22/10 Trial Tr. (Wells, J.) at 178; 6/2/10 Trial Tr. (Wood, T.) at 74.)

100.    Therefore, the chlorinated solvents travel vertically until they reach the fine grain layer. (4/22/10 Trial Tr. (Lindmark, U.) at 33; 4/22/10 Trial Tr. (Wells, J.) at 178; 4/23/10 Trial Tr. (Wells, J.) at 48.) At that point, the fine grain layer acts as a sponge and absorbs the contaminants. (4/23/10 Trial Tr. (Wells, J.) at 50.) In the fine grain layer, contaminants disperse in all directions, particularly in the direction of the fine grain layer slope, if one exists. (4/22/10 Trial Tr. (Lindmark, U.) at 33, 65; 4/23/10 Trial Tr.

(Wells, J.) at 48-49; 6/2/10 Trial Tr. (Wood, T.) at 74.) Over time, the contaminants can extend through the fine grain layer which causes a very high concentration of the contaminants in the fine grain layer. (4/22/10 Trial Tr. (Lindmark, U.) at 65.) The fine grain layer, however, may not retard all of the contaminants from continuing to migrate vertically into deeper soil. (*Id.*) The migration of contaminants is an extremely slow process that takes a significant amount of time to occur. (4/23/10 Trial Tr. (Wells, J.) at 54.)

101. The shallowest groundwater beneath the Property occurs at a depth of approximately one hundred forty (140) to one hundred forty-five (145) feet below ground surface. (Exs. 205, 207.) Groundwater generally flows from south to north below the Property. (Final Pretrial Conference Order at ¶ 49; 4/20/10 Trial Tr. (Simpson, T.) at 162; 4/22/10 Trial Tr. (Wells, J.) at 158, Ex. 207.) There is not a significant gradient; therefore, the groundwater is moving relatively slowly. (4/20/10 Trial Tr. (Simpson, T.) at 162.)

**H.    CURRENT CONDITIONS AT THE PROPERTY**

102. As part of the site investigation, the entire site, which is relatively small, has been peppered with boring locations. (4/21/10 1 Trial Tr. (Simpson, T.) at 52; Exs. 313-14.) Geomatrix has installed soil borings ("GMX" or "B"), vapor monitoring probes ("VP" or "vapor probes"), soil vapor extraction wells ("VEW" or "vapor extraction wells"), and groundwater monitoring wells ("MW") to determine the extent of the contamination at the Property. (Ex. 214.)

103. Soil, soil gas, and groundwater samples have been taken from these locations and analyzed by Geomatrix. (4/20/10 Trial Tr. (Simpson, T.) at 156, 160-61; 4/21/10 1 Trial Tr. (Simpson, T.) at 52; Exs. 203, 205.)

104. The chemicals of concern at the Property are mostly VOCs, specifically PCE and TCE, which have been detected in soil and

groundwater. (4/20/10 Trial Tr. (Krug, R.) at 118-119, 141-42; 4/22/10 Trial Tr. (Lindmark, U.) at 86; Ex. 207.) It is possible that at least some portion of the increase in TCE concentration at the Property is attributable to the degradation of PCE to TCE. (4/22/10 Trial Tr. (Lindmark, U.) at 11.)

105. Geomatrix and the DTSC have investigated potential upgradient sources of contamination but no such sources have been identified as contributing to the contamination at the Property. (4/21/10 1 Trial Tr. (Simpson, T.) at 24, 31; 4/22/10 Trial Tr. (Lindmark, U.) at 138; 4/23/10 Trial Tr. (Simpson, T.) at 118; Exs. 507, 523, 558, 636, 641-42.) Geomatrix, which had limited funding and required authorization from United Alloys' insurers to conduct its work, determined that it was more cost-effective to use the available funds to investigate site conditions and initiate a pilot study rather than divert resources to explore potential upgradient sources. (4/21/10 1 Trial Tr. (Simpson, T.) at 33-34.)

106. Nonetheless, the site has not yet been fully investigated or characterized. (4/20/10 Trial Tr. (Krug, R.) at 124.) The DTSC is focused on soil vapor extraction and has tabled the issue of groundwater investigation for future discussions. (*Id*. at 141; 4/21/10 1 Trial Tr. (Simpson, T.) at 40.) Additional groundwater monitoring wells are necessary to determine the extent to which groundwater is impacted. (4/20/10 Trial Tr. (Krug, R.) at 142.) Thus, dilution is currently the only form of contaminant level reduction with respect to groundwater. (4/21/10 1 Trial Tr. (Simpson, T.) at 43.)

107. Although the entire Property is contaminated, (*id*. at 26; 4/20/10 Trial Tr. (Krug, R.) at 118), the highest concentration of soil and soil vapor contamination is in the southwestern corner of the Property, the location where the ASTs and USTs were located. (4/22/10 Trial Tr. (Lindmark, U.) at 88; 4/23/10 Trial Tr. (Wells, J.) at 47-48; 4/23/10 Trial Tr. (Simpson, T.)

at 137; Exs. 319-21.)

108.   The highest detection of PCE at the Property is at VP-05, at fifteen (15) feet, which is directly in the AST area and near where Flask blended and containerized chlorinated solvents. (4/23/10 Trial Tr. (Wells, J.) at 46-47; Ex. 214.)  There are also high detections of PCE in the fine grain layer at VEW-16, VEW-17, and VEW-18. (4/23/10 Trial Tr. (Wells, J.) at 47; Exs. 214, 319.)

109.   In addition, substantial chlorinated solvent contamination occurred in the top fifteen (15) feet of soil and in the fine grain layer in and around the former UST area. (Exs. 214, 317, 319.)  For instance, GMX-5, which is located slightly north of the AST area, evidenced the highest concentration of PCE in the fine grain layer but also a substantial level of PCE at six and one-half (6.5) feet. (4/22/10 Trial Tr. (Wells, J.) at 165; 4/23/10 Trial Tr. (Wells, J.) at 40-41; Exs. 213-14, 317, 326.)  Sampling at GMX-5 also revealed PCE and TCE as deep as one hundred fifty and one-half (150.5) feet. (4/22/10 Trial Tr. (Lindmark, U.) at 98-99; Exs. 213-14, 317.) Significant concentrations of PCE and TCE occurred in the fine grain layer at GMX-2, GMX-4, VP-04, VEW-11, VEW-12, VEW-14, and VEW-15. (Exs. 213-14, 317, 319.)

110.   Similarly, there are elevated levels of PCE in the top fifteen (15) feet at VP-03, VP-04, VEW-11, VEW-12, VEW-14, VEW-15, and VEW-18. (4/22/10 Trial Tr. (Lindmark, U.) at 37-40; Exs. 214, 319.)   TCE is also present in high levels in the shallow soil vapor at VEW-14 and VEW-15. (Exs. 214, 319.)  This data is indicative of a proximal release, not an AST release. (6/2/10 Trial Tr. (Wood, T.) at 79-81.)  In other words, the shallow contamination in and around the former UST area at VEW-11, VEW-14, VEW-15, and VEW-18 was not caused by a spill in the AST area during Flask's tenancy. (*Id.*)

111. The 2008-09 data revealed higher contamination in and around the former UST area than the 1993-94 data and 1997 data. (4/22/10 Trial Tr. (Lindmark, U.) at 42-44; 4/22/10 Trial Tr. (Wells, J.) at 158-62; Exs. 320, 321, 323-25.)

112. In 1993-94, the conventional sampling method, which was used by WEECO at the Property, was to collect a sample in a brass tube, transfer it to a Ziploc bag, store it in an icebox, and send it to a laboratory. (4/22/10 Trial Tr. (Lindmark, U.) at 143; Ex. 407.) This procedure caused greater volatilization of samples, which, in turn, resulted in lower concentrations of volatiles reported in samples and more variability among samples. (4/22/10 Trial Tr. (Lindmark, U.) at 143-44.) In addition, in the 1993 soil samples, WEECO took and analyzed only one (1) or two (2) depth discrete samples from each boring location. (4/23/10 Trial Tr. (Wells, J.) at 37-38; Ex. 316.)

113. In 2008-09, samples were collected using vapor extraction wells and vapor probes. (4/22/10 Trial Tr. (Lindmark, U.) at 144.) The vapor extraction wells have screens of approximately thirty (30) feet whereas the vapor probes have screens of roughly three (3) to nine (9) inches. (*Id.* at 144-45.) The vapor probes consequently provide more depth discrete data. (*Id.* at 146; 4/22/10 Trial Tr. (Wells, J.) at 192.)

114. The vapor extraction wells, unlike earlier borings, intersect with the fine grain layer. (4/23/10 Trial Tr. (Simpson, T.) at 135-36.) Thus, some of the increased contamination can be attributed to more recent sampling of contaminants in the fine grain layer. (*Id.* at 136.)

115. The increased contamination levels in soil samples, however, cannot solely be attributed to improvements in sampling techniques, particularly due to a similar pattern of increased contamination in soil gas sampling. (4/22/10 Trial Tr. (Wells, J.) at 160-62; 6/2/10 Trial Tr. (Lindmark, U.) at 156-57; Ex. 320.)

116. The 1993-94 data also showed the presence of TCE in the soil beneath the degreasing room area. (4/22/10 Trial Tr. (Lindmark, U.) at 45; Ex. 320.) The contamination in the shallow soil at B-2 did not come from a release in the AST area. (6/2/10 Trial Tr. (Wood, T.) at 59; Ex. 316.)

117. Notwithstanding, samples taken from 1994 to 1997 show decreases in contamination outside of the building. (Exs. 213-14.) For example, GMX-3, a soil boring located outside of the building to the west of the degreaser area, showed a lower concentration of PCE. (4/23/10 Trial Tr. (Wells, J.) at 40, Exs. 213-14, 317.)

118. There is also a high concentration of PCE in a discrete portion of the northwestern area of the Property. (Exs. 214, 320.) MW-5, which is located approximately fifteen (15) to thirty (30) feet from the northern clarifier, reflected a considerable concentration of PCE and TCE in the fine grain layer. (4/22/10 Trial Tr. (Lindmark, U.) at 67-68, 135; 4/23/10 Trial Tr. (Wells, J.) at 39-40; Exs. 213-14, 317, 326.) MW-5 is located more than 200 feet from the northern edge of the former AST area. (4/22/10 Trial Tr. (Lindmark, U.) at 28; 4/22/10 Trial Tr. (Wells, J.) at 175; Exs. 213-14, 313.) The contamination at MW-5 did not come from a release in the former AST area. (4/22/10 Trial Tr. (Lindmark, U.) at 28-29; 4/22/10 Trial Tr. (Wells, J.) at 174-77; 6/2/10 Trial Tr. (Wood, T.) at 85-86; Exs. 213-14, 313.)

119. VP-01 and VEW-01, which are also located near the northern clarifier, likewise reflected an increased level of PCE and TCE in or slightly above the fine grain layer. (4/23/10 Trial Tr. (Wells, J.) at 42-43; Exs. 214, 318.) This contamination at VP-01 and VEW-01 did not come from a release in the AST area. (6/2/10 Trial Tr. (Wood, T.) at 84.)

120. There are thirteen samples throughout the Property containing levels of PCE higher than 500 µg/kg at a depth of 1.5 feet: VP-02, VP-03, VP-04, VEW-09, VEW-11, VEW-12, VEW-13, VEW-14, VEW-15, VEW-16,

VEW-18, VEW-19, and VEW-20. (Exs. 214, 318-19.)

121. In sum, the data indicates that there are at least two sources of contamination. (Ex. 209.) The contamination in the shallow soil is from a different source than the contamination in the deeper soil.

122. Flask admits that, based on the chemical and soil gas VOC concentrations, soil remediation is necessary. (Pretrial Conference Order at ¶ 63.) Flask also concedes that groundwater monitoring wells installed by Geomatrix are necessary. (4/22/10 Trial Tr. (Lindmark, U.) at 97.)

## CONCLUSIONS OF LAW

**A. FLASK IS LIABLE FOR CONTAMINATION AT THE PROPERTY PURSUANT TO 42 U.S.C. § 9607**

123. In 1980, Congress enacted CERCLA "in response to the serious environmental and health risks posed by industrial pollution." *Burlington N. & Santa Fe Ry. Co. v. United States*, __ U.S. __, 129 S. Ct. 1870, 1874 (2009). It "was designed to promote the '"timely cleanup of hazardous waste sites"' and to ensure that the costs of such cleanup efforts were borne by those responsible for the contamination." *Id.* (quoting *Consol. Edison Co. of N.Y., Inc. v. UGI Utils., Inc.*, 423 F.3d 90, 94 (2d. Cir. 2005)).

124. Under Section 107(a) of CERCLA, a private party may recover cleanup costs from those persons who contributed to the release of hazardous waste at the site. *Carson Harbor Vill., Ltd. v. County of Los Angeles*, 433 F.3d 1260, 1265 (9th Cir. 2006) ("*Carson Harbor Vill. II*").[11]

125. To establish a *prima facie* case, a plaintiff must demonstrate that: (1) the property at issue is a "facility"; (2) a "release" or "threatened release" of

---

[11] United Alloys initially asserted both a Section 107 claim and a Section 113 claim because, at the time of the filing of the Complaint, there was ambiguity as to the appropriate avenue for relief for a party in its position. However, "[t]he Supreme Court has made it clear that a [potentially responsible party] who has not been subject to a § 106 or a § 107 action, like [United Alloys], is not entitled to seek contribution under § 113. Instead [it] should proceed under § 107 for cost recovery." *Kotrous v. Goss-Jewett Co. of N. Cal.*, 523 F.3d 924, 934 (9th Cir. 2008). Therefore, the Court finds that United Alloys is not entitled to contribution pursuant to Section 113.

a "hazardous substance" from the facility has occurred; (3) the "release" or "threatened release" caused the plaintiff to incur response costs that were "necessary" and "consistent with the national contingency plan"; and (4) the defendant is among the potentially responsible parties ("PRP(s)") subject to liability under Section 9607(a). *Carson Harbor Vill. II*, 433 F.3d at 1265.

126.   A PRP may be compelled to clean up a contaminated area or reimburse a third party for its past and future response costs and/or damages. *See Burlington*, 129 S. Ct. at 1878.[12]

127.   The Court previously granted summary judgment in favor of United Alloys on the following issues: (1) Flask is a PRP as an operator of the facility during Flask's tenancy, (Order Granting in Part and Denying in Part Plaintiff United Alloys, Inc.'s Motion for Partial Summary Judgment Against Defendant Flask Chemical Corp. at 16 [Doc. No. 254]); (2) the Property was a facility during Flask's tenancy, (*id.*); and (3) a release of hazardous substances occurred at the facility during Flask's tenancy. (*Id.*)

128.   The only remaining issue with respect to United Alloys' Section 107 claim is whether the response costs are necessary and consistent with the national contingency plan ("NCP"). The NCP "specifies procedures for preparing and responding to contaminations and was promulgated by the Environmental Protection Agency (EPA) pursuant to CERCLA § 105." *City of Colton v. Am. Promotional Events, Inc.-West*, 614 F.3d 998, 1003 (9th Cir. 2010) (quoting *Cooper Indus., Inc. v. Aviall Servs., Inc.*, 543 U.S. 157, 161 n.2 (2004)).

129.   The NCP "is 'designed to make the party seeking response costs

---

[12]   Under CERCLA, a PRP shall be liable for: "(A) all costs of removal or remedial action incurred by the United States Government or a State or an Indian tribe not inconsistent with the national contingency plan; (B) any other necessary costs of response incurred by any other person consistent with the national contingency plan; (C) damages for injury to, destruction of, or loss of natural resources, including the reasonable costs of assessing such injury, destruction, or loss resulting from a release; and (D) the costs of any health assessment or health effects study carried out under section 104(i)." 42 U.S.C. § 9607(a)(4).

choose a cost-effective course of action to protect public health and the environment.'" *Carson Harbor Vill. II*, 433 F.3d at 1265 (quoting *Washington State Dep't of Transp. v. Washington Natural Gas Co.*, 59 F.3d 793, 802 (9th Cir. 1995)). The term "response" means removal and remedial actions, including enforcement activities related to such actions.[13] 42 U.S.C. § 9601(25). The terms "remove" or "removal," in turn, include actions that are necessary to monitor, assess, and evaluate the release of hazardous substances. 42 U.S.C. § 9601(23).

130. A private party's response action is considered "necessary" when "an actual and real threat to human health or the environment exist before initiating a response action." *Carson Harbor Vill., Ltd. v. Unocal Corp.*, 270 F.3d 863, 871 (9th Cir. 2001) (en banc). It is "considered 'consistent with the NCP' if the action, when evaluated as a whole, is in *substantial compliance* with the applicable requirements of [40 C.F.R. § 300.700(c)(5)-(6)] and results in a CERCLA-quality clean up." 40 C.F.R. § 300.700(c)(3)(i) (emphasis added). Immaterial or insubstantial deviations from the NCP do not preclude recovery in a cost recovery action. 40 C.F.R. § 300.700 (c)(4).

131. The private party seeking reimbursement for response costs bears the burden of demonstrating that its actions are consistent with the NCP. *Carson Harbor Vill. II*, 433 F.3d at 1265; *see also Ameripride Servs. v. Valley Indus. Serv.*, 2011 U.S. Dist. LEXIS 55634, *40 (E.D. Cal. May 12, 2011) (Karlton, J.).

132. United Alloys presented evidence of invoices enumerating costs for, *inter alia*, conducting site investigations, installing and monitoring soil

---

[13] A removal action is a "short-term action[] taken to halt the immediate risks posed by hazardous wastes" whereas a remedial action is an action taken to implement a permanent remedy. *Carson Harbor Vill., Ltd. v. Unocal Corp.*, 287 F. Supp. 2d 1118, 1155 (C.D. Cal. 2003) (Morrow, J.) (quoting *Advanced Micro Devices, Inc. v. Nat'l Semiconductor Corp.*, 38 F. Supp. 2d 802, 810 (N.D. Cal. 1999) (Whyte, J.)).

borings and wells, extracting soil, soil vapor, and groundwater samples, and paying consultant fees. (Final Pretrial Conference Order at ¶¶ 36, 39, 42; 4/20/10 Trial Tr. (Donn, R.) at 40-42, 45-51; Exs. 407, 426.) To date, United Alloys has expended $449.923.04 in connection with such work.[14] (4/20/10 Trial Tr. (Donn, R.) at 40-42, 45-51; Exs. 408, 426, 430-33, 671.) United Alloys' liability insurers have spent $1,283,722.81 for Geomatrix's services. (4/20/10 Trial Tr. (Donn, R.) at 43-44; Ex. 430; United Alloys, Inc. Trial Br. at 14-15[Doc. No. 271].) United Alloys owes the Regional Board an additional amount of $21,414.58. (Ex. 432.)

133. These costs are necessary because PCE and TCE, which are listed as hazardous substances under CERCLA, pose an actual and real threat to public health and the environment. *See* 42 U.S.C. § 9601(14); *see also* 40 C.F.R. § 302.4. There is no dispute that PCE and TCE are present in the soil at multiple locations throughout the Property. (*See* Pretrial Conference Order at ¶¶ 37, 63.) Flask concedes that the chemical and soil gas VOC concentrations require remediation with respect to soil. (*Id*. at ¶ 63.) The parties also stipulated that DTSC will require: (1) additional site investigation; (2) remediation; and (3) continued quarterly groundwater monitoring to evaluate the effectiveness of the soil vapor extraction remedy. (6/3/10 Trial Tr. at 49-50.)

134. These costs are likewise consistent with the NCP because they are essential to assessing, evaluating, monitoring, and identifying a remedy for the release of PCE and TCE at the Property.

135. Simpson, who has served as the project manager for Geomatrix, and

---

[14] Specifically, United Alloys incurred the following expenses in connection with the site investigation of the Property: (1) $4,075 paid to Green Environmental; (2) $24,100 paid to WEECO; (3) $232,981.09 paid to Geomatrix; (4) $6,376.34 to the Water Board; (5) $25,695 to DTSC; and (6) $102,063.82 to CAPS. (4/20/10 (Donn, R.) at 40-42, 45-51; Exs. 408, 426, 430-32, 671; United Alloys, Inc. Trial Br. at 11-15 [Doc. No. 271].) The total amount of all invoices from the DTSC is $54,631.79 but United Alloys has at least one outstanding invoice. (4/20/10 Donn, R. at 49; Ex. 433.)

Krug, who has served as the project manager for DTSC, both testified that the work performed to date at the Property has complied with the NCP. (4/20/10 Trial Tr. (Krug, R.) at 120-21; 4/20/10 Trial Tr. (Simpson, T.) at 174.)

136. Flask's contention at trial was that Geomatrix improperly focused on the existence of groundwater contamination at the Property to trigger coverage by Flask's insurance carriers while ignoring potential sources caused by United Alloys. It was also Flask's assertion that Geomatrix's work was not cost-effective due to the length of the site investigation and the failure to implement a remedy. Also, Flask contended that Geomatrix purposefully excluded data collected by WEECO in Geomatrix's reports to the Regional Board and/or the DTSC.

137. The record, however, demonstrates that the costs incurred by United Alloys are NCP-compliant and Flask's contentions are not supported by the evidence. Geomatrix has collected and analyzed samples from locations throughout the Property, including areas in which United Alloys used PCE, and concluded that the *entire* Property is contaminated. (4/20/10 Trial Tr. (Simpson, T.) at 156, 160-61; 4/21/10 1 Trial Tr. (Simpson, T.) at 26, 52; Ex. 214.) Geomatrix and the DTSC have also investigated potential upgradient sources of contamination and concluded that such sources are not contributing to the contamination at the Property. (4/20/10 Trial Tr. (Simpson, T.) at 159-64; 4/21/10 1 Trial Tr. (Simpson, T.) at 24, 31; 4/22/10 Trial Tr. (Lindmark, U.) at 138; 4/23/10 Trial Tr. (Simpson, T.) at 118; Exs. 507, 523, 558, 636, 641-42.)

138. Indeed, there has been substantial participation and oversight from public agencies during the site investigation of the Property, which further supports the Court's conclusion that the investigation methods and activities are legitimate. Specifically, a public agency -- either the Regional Board or

the DTSC -- has been involved in the regulatory oversight of the Property since 2000. (Final Pretrial Conference Order at ¶¶ 48, 56; 4/20/10 Trial Tr. (Donn, R.) at 44-45, 47-48; 4/20/10 Trial Tr. (Krug, R.) at 114; Ex. 432.) The Regional Board and the DTSC have also repeatedly required Geomatrix to conduct additional investigation activities and compile supplementary data and Geomatrix has consistently complied with such requests. (Final Pretrial Conference Order at ¶¶ 48, 53-55, 57-60; 4/20/10 Trial Tr. (Simpson, T.) at 158-74; Exs. 203, 208, 210, 442, 455-56, 575.) Moreover, the VCA expressly requires that all work shall be performed consistent with the NCP. (Ex. 671.)

139. There is also no credible evidence that the work was not cost-effective, even with the delay. Rather, the record reflects that Geomatrix attempted to eliminate the expensive pump-and-treat system for groundwater by submitting a Conceptual Remedial Action Plan to the Regional Board. (4/20/10 Trial Tr. (Simpson, T.) at 164-65.) With respect to groundwater contamination, both the Regional Board and the DTSC have recognized that, at the very least, further groundwater monitoring is necessary. (4/20/10 Trial Tr. (Krug, R.) at 119, 141-42; 4/20/10 Trial Tr. (Simpson, T.) at 188-89; 4/21/10 1 Trial Tr. (Simpson, T.) at 43; 6/3/10 Trial Tr. at 49-50.)

140. Finally, the evidence establishes that Geomatrix decided not to include WEECO data because Geomatrix concluded that WEECO conducted a preliminary, not a comprehensive, investigation of the Property. (4/21/10 1 Trial Tr. (Simpson, T.) at 25.) In particular, WEECO installed borings and collected only one (1) or two (2) samples for analysis. (4/21/10 1 Trial Tr. (Simpson, T.) at 25.) When the data was requested by the Regional Board and/or the DTSC, Geomatrix provided it. (*Id.* at 25-26.) The Court concludes that there is no basis for finding that Geomatrix's

efforts have not been cost-effective or legitimate.

141. Because CERCLA expressly permits the recovery of response costs, United Alloys does not need to show that it cleaned up the Property before it can recover investigation costs. *See Wickland Oil Terminals v. Asarco, Inc.*, 792 F.2d 887, 892 (9th Cir. 1986) (concluding that a private party may obtain reimbursement for response costs prior to lead agency approval of a cleanup program); *see also Hinds Invs., L.P. v. Ryan*, 2009 U.S. Dist. LEXIS 35053, *8 (C.D. Cal. Apr. 6, 2009) (Guilford, J.) (finding that the plaintiffs incurred response costs where they provided evidence of the costs of an investigation conducted by environmental consultants).

142. There is a nexus between the NCP-compliant costs incurred by United Alloys and the cleanup that will inevitably occur because both parties agree that -- at the very least -- the DTSC will require soil remediation at the Property. *See Vill. of Milford v. K-H Holding Corp.*, 390 F.3d 926, 933 (6th Cir. 2004) ("Monitoring and evaluation costs may be recovered as 'removal' costs under CERCLA if they were reasonable, and the activities were not scientifically deficient or unduly costly."); *see also Johnson v. James Langley Operating Co.*, 226 F.3d 957, 963-64 (8th Cir. 2000).

143. Contrary to Flask's assertion, (Flask Chemical Corp.'s Mem. of Contentions of Law and Fact at 3 [Doc. No. 261]), public participation is not a prerequisite to the recovery of investigatory costs. "Denying private claimants recovery of [response] costs would discourage voluntary cleanup activities because such claimants would need to incur much more substantial costs before knowing for certain whether they are entitled to reimbursement. Such a result is incompatible with Congress's desire to promote prompt cleanup of contaminated sites." *Vine St., LLC v. Keeling*, 460 F. Supp. 2d 728, 760 (E.D. Tex. 2006) (Davis, J.) (concluding that a

private party may recover investigatory and monitoring costs prior to the initiation of an actual cleanup). Moreover, the VCA requires that the proposed remedial action will be subject to public comment. (Ex. 671.)

144. Therefore, United Alloys has demonstrated that it incurred response costs that were necessary and consistent with the NCP.

145. Accordingly, Flask is liable for contamination of the Property pursuant to Section 107 of CERCLA.

146. Prejudgment interest is mandatory in CERCLA cases. 42 U.S.C. § 9607(a). "Such interest shall accrue from the later of (i) the date payment of a specified amount is demanded in writing, or (ii) the date of the expenditure concerned." *Id.* Neither party addressed the issue of prejudgment interest. Therefore, further briefing is necessary to determine the appropriate calculation of prejudgment interest.

**B.   FLASK IS JOINTLY AND SEVERALLY LIABLE FOR RESPONSE COSTS PURSUANT TO 42 U.S.C. § 9607**

147. CERCLA is a strict liability statute; therefore, there is a presumption of joint and several liability, unless the harm is divisible. *Burlington*, 129 S. Ct. at 1880-81. "[W]hen two or more persons acting independently caused a distinct or single harm for which there is a reasonable basis for division according to the contribution of each, each is subject to liability only for the portion of the total harm that he has himself caused . . . But where two or more persons cause a single and indivisible harm, each is subject to liability for the entire harm." *United States v. Chem-Dyne Corp.*, 572 F. Supp. 802, 810 (S.D. Ohio 1983) (Rubin, J.) (citations omitted).

148. To avoid joint and several liability, a defendant must show that the harm is capable of apportionment. *Burlington*, 129 S. Ct. at 1881. In making this determination, courts may not rely on equitable considerations. *Id.* at 1882 n.9.

149. Based on a spatial analysis of the Property, Flask contended at trial that it should only be responsible for eighteen percent (18%) to twenty percent (20%) of response costs. (4/22/10 Trial Tr. (Wells, J.) at 176-77.) These percentages correspond with the approximate size of the AST area in relation to the entire Property. (*Id*. at 177.)

150. The Court finds that Flask has not met its burden of demonstrating that there is a meaningful basis for apportioning liability. *See Burlington*, 129 S. Ct. at 1881 ("When two or more causes produce a single, indivisible harm, 'courts have refused to make an arbitrary apportionment for its own sake, and each of the causes is charged with responsibility for the entire harm.'") (citations omitted).

151. The Court concludes that the entire Property, which is relatively small, is contaminated. (4/20/10 Trial Tr. (Krug, R.) at 118; 4/21/10 1 Trial Tr. (Simpson, T.) at 26.) Moreover, the majority of the contamination has been traced to the southwestern corner of the Property, the site in which the ASTs were located during Flask's tenancy. Therefore, eighteen percent (18%) to twenty percent (20%) is not representative of the impact of that area on the overall contamination of the Property.

152. Furthermore, neither Flask nor United Alloys presented credible evidence as to which party was responsible for the contamination in the area to the north of the former AST area, in which the USTs were located. There are no percipient witnesses or contemporaneous records identifying the procedure for filling the excavation area and none of the expert witnesses' opinions provided a reliable explanation as to how the native soil and the import soil were returned to the excavation area. Because both parties conducted operations in this area and the area corresponds to a significant amount of the contamination at the Property, the Court concludes that the harm to the Property is not capable of apportionment.

153. Under these circumstances, joint and several liability is appropriate.

## C. FLASK IS ENTITLED TO CONTRIBUTION FROM UNITED ALLOYS PURSUANT TO 42 U.S.C. § 9613(f)(1)

154. "Any person may seek contribution from any other person who is liable or potentially liable under Section 107(a)." 42 U.S.C. § 9613(f)(1). The allocation of costs corresponds to each party's equitable share of the responsibility. *United States v. Atl. Research Corp.*, 551 U.S. 128, 140 (2007). Thus, even when apportionment of liability is not possible, a defendant may seek contribution from a Section 107 plaintiff. *Burlington*, 129 S. Ct. at 1882 n.9. In allocating response costs among PRPs, courts may rely on equitable considerations. *See* 42 U.S.C. § 9613(f)(1) (providing that "[i]n resolving contribution claims, the court may allocate response costs among liable parties using such equitable factors as the court determines are appropriate.")

155. Although not an exhaustive list, the Ninth Circuit has endorsed the use of the "Gore factors," equitable factors to be considered in allocating costs pursuant to a Section 113 claim. *See Boeing v. Cascade Corp.*, 207 F.3d 1177, 1187 (9th Cir. 2000). The "Gore Factors" include: (1) the ability of the parties to demonstrate that their contribution to a discharge, release, or disposal of a hazardous waste can be distinguished; (2) the amount of the hazardous waste involved; (3) the degree of toxicity of the hazardous waste involved; (4) the degree of involvement by the parties in the generation, transportation, treatment, storage, or disposal of the hazardous waste; (5) the degree of care exercised by the parties with respect to the hazardous waste concerned, taking into account the characteristics of such hazardous waste; and (6) the degree of cooperation by the parties with Federal, State, or local officials to prevent any harm to the public health or the environment. *Kerr-McGee Chem. Corp. v. Lefton Iron & Metal Co.*, 14

F.3d 321, 326 (7th Cir. 1994). Other equitable factors include whether a party knew or acquiesced to the release of hazardous waste and whether a party benefitted from the contamination. *See Adobe Lumber, Inc. v. Hellman*, 658 F. Supp. 2d 1188, 1201 n.2 (E.D. Cal. 2009) (Shubb, J.).

156. As explained below, United Alloys is a PRP because it released a hazardous substance, PCE, at the Property, which the Court has already determined was a facility, during its ownership of the Property. *See Carson Harbor Vill. II*, 433 F.3d at 1265.

157. Having considered all of the credible evidence presented at trial, the Court finds that both parties are responsible for releases of hazardous waste at the Property.

158. Both parties used PCE, which qualifies as hazardous waste under CERCLA, in their operations at the Property. Flask stored, processed, and sold PCE and TCE at the Property. (Final Pretrial Conference Order at ¶¶ 8-10.) United Alloys' used PCE in its clarifiers and degreaser. (*Id.* at ¶ 31; Castellanos Dep. at 12, 16-19, 28, 34, 51-54, 56-57; 4/22/10 Trial Tr. (Lindmark, U.) at 9-18; Exs. 242-47, 438-39, 671.) Because both parties used PCE, the degree of toxicity of the hazardous waste is identical.

159. Due to the pattern of contamination in the fine grain layer and the shallow soil, the evidence demonstrates that there were at least two different sources of contamination. (*See* Ex. 209.)

160. With respect to Flask, there were numerous documented spills during its tenancy, including spills caused by: (1) the transfer of PCE from railcars onto the Property, (Heisler Dep. at 60, 65-66, 73-74); (2) the transfer of chlorinated solvents from tanker trucks to Flask's chemical containers, (*id.* at 59-60); (3) forklifts puncturing drums inside of the facility, (*id.* at 56-57); and (4) an act of vandalism in which five hundred (500) gallons of PCE were released from an AST. (*Id.* at 79-80.)

161. With respect to United Alloys, there is circumstantial evidence that it also contributed to the contamination at the Property. *See Franklin Cnty. Convention Facilities Auth. v. Am. Premier Underwriters. Inc.*, 240 F.3d 534, 547 (6th Cir. 2001) ("[T]here is nothing objectionable in basing findings solely on circumstantial evidence, especially where the passage of time has made direct evidence difficult or impossible to obtain."). In particular, United Alloys used PCE in its northern clarifier and there is significant contamination from PCE in the shallow soil and the fine grain layer in this area. (4/22/10 Trial Tr. (Lindmark, U.) at 67-68, 135; 4/23/10 Trial Tr. (Wells, J.) at 39-40; Exs. 213-14, 317, 326.) This contamination did not come from a release in the former AST area. (4/22/10 Trial Tr. (Lindmark, U.) at 28-29; 4/22/10 Trial Tr. (Wells, J.) at 174-77; 6/2/10 Trial Tr. (Wood, T.) at 85-86; Exs. 213-14, 313.) There was also a spill in the degreasing room. (4/21/10 2 Trial Tr. (Lindmark, U.) at 48; 4/22/10 Trial Tr. (Lindmark, U.) at 114-15, 118.)

162. The Court concludes that *some* of the contamination can be distinguished by the parties. Flask is responsible for the contamination in the southwestern corner of the Property, the area in which the ASTs were located during Flask's tenancy. (*See* Final Pretrial Conference Order at ¶ 10; Exs. 214, 310, 445.) United Alloys is responsible for the contamination in the northern portion of the Property, the area in which it installed and used the northern clarifier. (*See* Final Pretrial Conference Order at ¶ 35; Exs. 214, 312.)

163. However, neither Flask nor United Alloys established that their contribution to the release of PCE at the Property can be distinguished from a release by the opposing party in the area to the north of the AST area. In particular, the parties failed to present credible evidence as to which party is responsible for the contamination in the top fifteen (15) feet of soil and in

the fine grain layer in this area. (Exs. 214, 317, 319.) Flask used USTs, a clarifier, a blending tank, a filling machine, pumps, a scale, and a conveyor in this area to store, mix, blend, and containerize chlorinated solvents. (Final Pretrial Conference Order at ¶¶ 11, 14, 22; 4/22/10 Trial Tr. (Lindmark, U.) at 113; 4/23/10 Trial Tr. (Wells, J.) at 14-15, 23-24; Ex. 310.) At this location, Flask also used pumps to fill the tanks or tanker trucks that arrived with deliveries. (4/22/10 Trial Tr. (Lindmark, U.) at 113; 4/23/10 Trial Tr. (Wells, J.) at 14-15, 23-24; Ex. 310.) United Alloys, meanwhile, used the southern clarifier and stored waste in the area to the north of the ASTs. (Final Pretrial Conference Order at ¶ 22; Castellanos Dep. at 50-51, Ex. 9; 4/23/10 Trial Tr. (Wells, J.) at 19-21; Ex. 312.) Finally, no witnesses provided credible evidence as to the method used to excavate the USTs and return the soil to the ground. Therefore, the Court is unable to distinguish which party is responsible for the contamination in the area to the north of the ASTs.

164.   The parties are similarly unable to distinguish contamination that occurred inside of the Main Building because there is evidence that both parties were responsible for spills inside of the facility, either from the degreasing room or from storage drums. (Heisler Dep. at 56-57; 4/21/10 2 Trial Tr. (Lindmark, U.) at 48; 4/22/10 Trial Tr. (Lindmark, U.) at 114-15, 118.)

165.   United Alloys used substantially less VOCs than Flask but has occupied the Property significantly longer than Flask. United Alloys, which has owned the Property since January 1979, used no more than 8,000 gallons of PCE per year through 1997. (Final Pretrial Conference Order at ¶ 31; 4/22/10 Trial Tr. (Wells, J.) at 172-73; Ex. 301.) The Court does not find Wood provided a reasonable basis for determining Flask's hazardous waste usage; however, the Court is satisfied that Flask used exponentially

more PCE per year than United Alloys. Although it used more hazardous waste, Flask leased the Property for less than seven years. (Final Pretrial Conference Order at ¶ 8.)

166.   United Alloys exercised considerably more care with respect to hazardous waste. Flask failed to instruct or train its employees as to how to avoid spillage in the unloading of chemicals from railcars delivering PCE to the Property. (Heisler Dep. at 104-05.) Although there were accidental spills during Flask's operations at the Property, (Final Pretrial Conference Order at ¶ 17), Flask made no effort to clean up the spills or report such spills to any agency or entity. (Heisler Dep. at 63, 67, 73-74.) United Alloys, on the other hand, reported at least one spill from a 55-gallon drum of TCE into the street near the Property. (Ex. 250.) United Alloys also complied with a 90-day hazardous waste removal policy necessitated by the use of the clarifiers and the degreaser at the Property. (4/23/10 Trial Tr. (Simpson, T.) at 113-14; 6/2/10 Trial Tr. (Wood, T.) at 16-17.)

167.   Since 1993, United Alloys has cooperated with public agencies, including the Regional Board and the DTSC, to investigate the contamination and clean up the property. (Final Pretrial Conference Order at ¶¶ 48, 53-60; 4/20/10 Trial Tr. (Donn, R.) at 44-45, 47-48; 4/20/10 Trial Tr. (Krug, R.) at 114; Ex. 432.)   Flask, on the other hand, has no history of cooperating with Federal, State, or local officials. In fact, during its tenancy, it failed to report any of the numerous accidental spills to the appropriate authorities.

168.   United Alloys asserted the following affirmative defenses: (1) act of a third party; (2) no joint and several liability; and (3) contribution. (Final Pretrial Conference Order at 19.) The first two affirmative defenses fail on the merits because United Alloys is responsible for a portion of the contamination at the Property. With respect to contribution, United Alloys

shall only be allocated costs in accordance with its proportionate share of
responsibility.

169. Based on these equitable considerations, the Court finds that United
Alloys is to be allocated one-third of the past response costs and Flask is to
be allocated two-thirds of the past response costs.

**D. SETTLEMENT PROCEEDS FROM THIRD PARTY DEFENDANTS IN THIS ACTION MUST BE DEDUCTED FROM THE OUTSTANDING RESPONSE COSTS**

170. As an additional equitable factor, the Court considers the impact of
monies paid to United Alloys by settling defendants. *See* 42 U.S.C. §
9613(f)(1) (providing that the court may consider "such equitable factors as
the court determines are appropriate."); *see also Boeing*, 207 F.3d at 1189-
90 (factoring settlement proceeds into the allocations of costs because
preventing double recovery is an appropriate equitable factor to be
considered by the district court); *see also Goodrich Corp. v. Town of
Middlesbury*, 311 F.3d 154, 176 (2d Cir. 2002) (affirming district court's
decision to offset a third party defendant's prior settlement because the
district court has broad discretion with respect to equitable factors).

171. CERCLA permits offsets to contribution from administrative or
judicially approved settlements which resolved liability to the United States
or a State. 42 U.S.C. § 9613(f)(2). "Although § 9613(f)(2) governs only
the effect of settlements with the government, not private parties, general
equitable principles remain in play." *K.C. 1986 L.P. v. Reade Mfg.*, 472
F.3d 1009, 1017 (8th Cir. 2007). One of these equitable principles is the
prohibition of double recovery. *Id.*; *see also* 42 U.S.C. § 9614(b)
(providing that, if a party receives compensation pursuant to CERCLA,
such party cannot recover compensation for the same costs pursuant to any
other State or Federal law).

172. This result comports with common sense as the environment is the injured party, not the plaintiff. *Basic Mgmt. v. United States*, 569 F. Supp. 2d 1106, 1124 (D. Nev. 2008) (Jones, J.) "In other words, [a p]laintiff[ has] not been damaged and [is] not 'entitled' to money as a damaged party; but rather, [a p]laintiff[] can only receive reimbursement for the costs [it] expended beyond [its] share of actual responsibility for the environmental damage." *Id.*

173. On January 13, 1997, the Court approved the settlements of Siskin, Baker, and Harold A. Baker Metal Supply Company, Inc. (Final Pretrial Conference Order at ¶ 46.) These settlements totaled $290,000. (Flask Chemical Corp.'s Post-Trial Findings of Fact and Conclusions of Law at 50 [Doc. No. 301].) The settlement proceeds have been used for environmental remediation. (4/20/10 Trial Tr. (Donn, R.) at 64-65.)

174. The parties stipulated that United Alloys also entered a settlement with the Railroads, who were initially named as defendants in this action, in the amount of $50,000 and a settlement with Chubb in the amount of $300,000. (4/21/10 2 Trial Tr. at 35.)

175. Flask is entitled to offset for the monies recovered by United Alloys from settlements with Siskin, Baker, Harold A. Baker Metal Supply Company, Inc., and the Railroads because these parties were PRPs who contributed to funding the remediation of the Property. Otherwise, United Alloys would receive double recovery for its response costs. These settlements totaled $340,000.

176. Flask, however, is not entitled to offset for United Alloys' settlement with Chubb. The settlement funds were expressly intended to fund litigation costs and/or future response costs. (United Alloys, Inc.'s Response to Flask Chemical Corp.'s Supplemental Trial Br. at 18. Ex. D [Doc. No. 297].) Because the settlement was not designed to reimburse

United Alloys for past response costs, the Court declines to offset these funds. *See United States v. Iron Mt. Mines*, 724 F. Supp. 2d 1086, 1093 (E.D. Cal. 2010) (Mendez, J.) (finding that the defendants were not entitled to a credit for past response costs because the settlement provided that the funds were designated for future cleanup and maintenance costs).

177.    Accordingly, Flask is entitled to a credit of $340,000 for third party settlements to be applied to the outstanding response costs incurred by United Alloys to date.

E.    **THE COLLATERAL SOURCE RULE IS NOT APPLICABLE**

178.    Based on the collateral source rule, United Alloys seeks to recover $1,283,722.81 paid by its liability insurers for site investigation and remediation. (United Alloys, Inc. Trial Br. at 14-15 [Doc. No. 271]).

179.    "The 'collateral source rule' holds that the payment of compensation from a source wholly independent of the tortfeasor should not be deducted from the damages that the plaintiff is otherwise entitled to collect from the tortfeasor." *Kennedy v. United States*, 2009 U.S. Dist. LEXIS 95543, *21-22 (C.D. Cal. Oct. 13, 2009) (Feess, J.).

180.    The Court has found no case law in which the collateral source rule was extended to CERCLA actions. *See Keeling*, 460 F. Supp. 2d at 765-66 (declining to apply the collateral source rule to CERCLA cases).   Indeed, various CERCLA provisions expressly prohibit a claimant from double recovery. *See* 42 U.S.C. §§ 9612(f) ("Where the President has paid out of the [Hazardous Substance Superfund ("the Fund")] for any response costs or any costs specified under section 111(c)(1) or (2) . . ., no other claim may be paid out of the Fund for the same costs.") and 9614(b) (prohibiting double recovery). The Court therefore declines to apply the collateral source rule to the recovery of response costs in this action.

181.    The Court is not persuaded that the result should be any different

where the costs were paid by United Alloys' insurers, rather than the result of a third party settlement.

182.   In both cases, the funds did not come directly from United Alloys "pockets." *See Basic Mgmt.*, 569 F. Supp. 2d at 1123 (concluding that the plaintiffs cannot recover response costs paid directly by their insurers because CERCLA bars double recovery).   In other words, United Alloys can only recover costs that it has paid that exceed its proportionate share of responsibility for the contamination at the Property.

183.   Accordingly, the Court finds that Plaintiff is not entitled to recover the $1,283,722.81 paid by United Alloys' liability insurers to Geomatrix.

**F.   DECLARATORY RELIEF PURSUANT TO 42 U.S.C. § 9613(g)(2) IS APPROPRIATE IN THIS ACTION**

184.   CERCLA provides for declaratory relief as to future response costs when a plaintiff establishes Section 107 liability. 42 U.S.C. § 9613(g)(2) (providing that "the court shall enter a declaratory judgment on liability for response costs or damages that will be binding on any subsequent action or actions to recover further response costs or damages.").

185.   A claim for declaratory relief as to CERCLA liability is ripe "so long as there has been a release of hazardous substances, and the plaintiff spends some money responding to it." *City of Colton v. Am. Promotional Events, Inc.-West*, 614 F.3d 998, 1005 (9th Cir. 2010).

186.   The Ninth Circuit has held that "if a plaintiff successfully establishes liability for the response costs sought in the initial cost-recovery action, it is entitled to a declaratory judgment on present liability that will be binding on future cost-recovery actions." *Id.* at 1007.

187.   Flask argues that United Alloys is not entitled to a declaratory judgment because: (1) United Alloys has delayed in remediating the Property, (Flask Chemical Corp.'s Supplemental Trial Br. at 6 [Doc. No.

295]); (2) groundwater is not impacted by the soil contamination, (*id.*); and (3) there is no way for the Court to allocate future response costs without specific evidence as to the nature and amount of such costs. (*Id.*)

188. Flask's arguments are unavailing. There is no precedent precluding declaratory relief due to a delay in remediation.

189. Furthermore, the evidence belies Flask's contention that the groundwater below the Property is not contaminated. There are VOCs in the groundwater but the Property requires more groundwater monitoring wells to determine the scope of the impact. (4/20/10 Trial Tr. (Krug, R.) at 119, 141-42.) Thus, the DTSC will require additional well installation and monitoring. (4/20/10 Trial Tr. (Simpson, T.) at 188-89.) Even Flask concedes that DTSC will require additional site investigation, including installation of additional groundwater wells and continued quarterly groundwater monitoring to evaluate the effectiveness of the soil vapor extraction remedy. (6/3/10 Trial Tr. at 49-50.)

190. Finally, it is not necessary to determine the nature and amount of future response costs prior to awarding a declaratory judgment in favor of United Alloys. *See Boeing*, 207 F.3d at 1191 ("The costs and time involved in relitigating issues as complex as these where new costs are incurred would be massive and wasteful. Declaratory relief allocating future costs is therefore consistent with the broader purposes of CERCLA."). The purpose of declaratory relief is to promote judicial efficiency by permitting a Court to determine the responsible party's liability and then requiring such party to bear the responsibility "for the cost of finishing the job." *City of Colton*, 614 F.3d at 1008 (quoting *Dant & Russell*, 951 F.2d 246, 249-50 (9th Cir. 1991)).

191. United Alloys has successfully established liability for the response costs incurred to date. Therefore, United Alloys is entitled to a declaratory

judgment with respect to future response costs that are consistent with the NCP. *City of Colton*, 614 F.3d at 1007 ("In section 113(g)(2), Congress specified a mechanism whereby a declaration of liability for costs already incurred has preclusive effect in future proceedings as to costs yet to be incurred.").

192.   The Court likewise finds that declaratory relief is appropriate as to the allocation of future NCP-compliant response costs. Thus, United Alloys is responsible for one-third of such response costs and Flask is responsible for two-thirds of such response costs.

## G.   FLASK IS LIABLE FOR CONTAMINATION AT THE PROPERTY PURSUANT TO THE CARPENTER-PRESLEY-TANNER HAZARDOUS SUBSTANCE ACCOUNT ACT

193.   The Carpenter-Presley-Tanner Hazardous Substance Account Act ("HSAA") provides that "[a]ny person who has incurred removal or remedial action costs in accordance with this chapter or the federal act may seek contribution or indemnity from any person who is liable pursuant to this chapter." Cal. Health & Saf. Code § 25363(e).

194.   The HSAA is interpreted consistent with CERCLA. *See Hellman*, 658 F. Supp. 2d at 1192-93; *see also Ryan*, 2009 U.S. Dist. LEXIS 35053 at *9-10. The HSAA expressly incorporates the liability standards and defenses set forth in CERCLA and creates liability for the same classes of persons. *See, e.g.,* Cal. Health & Saf. Code §§ 25310, 25323.3, 25323.5(a), (b). Liability under the HSAA is therefore almost identical to liability under CERCLA.

195.   However, HSAA does not impose liability for acts that occurred prior to January 1, 1982, if those acts did not violate existing federal laws at the time they occurred. Cal. Health & Saf. Code § 25366(a).

196.   Flask operated its chemical distribution facility at the Property from

November 1972 to January 1979. (Final Pretrial Conference Order at ¶ 8.) It was established prior to trial that Flask used PCE and TCE in its operations. (*Id.* at ¶ 10.) Therefore, it is likely that at least some of the contamination occurred prior to the passage of the HSAA but after the passage of the Resource Conversation and Recovery Act of 1976, 42 U.S.C. § 6901 *et seq.* (*See* Heisler Dep. at 79.)

197.  Consequently, United Alloys is entitled to contribution from Flask under HSAA.

198.  CERCLA, however, precludes double recovery. *See Santa Clara Valley Water Dist. v. Olin Corp.*, 655 F. Supp. 2d 1048, 1055 (N.D. Cal. 2009) (Whyte, J.).  It provides that "[a]ny person who receives compensation for removal costs or damages or claims pursuant to this Act shall be precluded from receiving compensation for the same removal costs or damages or claims pursuant to any other State or Federal law." 42 U.S.C. § 9614(b).

199.  Consequently, CERCLA preempts United Alloys' right to recover costs under the HSAA in addition to CERCLA.

**H.   CONCLUSION**

200.  United Alloys has incurred NCP-compliant response costs in the amount of $449.923.04;

201.  Flask is entitled to a credit of $340,000 for settlements paid to United Alloys by third party defendants, which reduces United Alloys' recoverable response costs to $109,923.04;

202.  As to the $109,923.04, United Alloys shall pay one-third of these response costs, or $36,604.37, and Flask shall pay two-thirds of these response costs, or $73,318.67;

203.  Further briefing is necessary for the Court to make a determination as to the amounts recoverable for prejudgment interest;

204. Declaratory relief shall be entered as to the apportionment of liability and allocation of costs for future NCP-compliant response costs.

205. Judgment shall be entered subsequent to the briefing as to prejudgment interest and the Court's calculation thereof; and

206. To the extent that any findings of fact constitute conclusions of law, they are adopted as such, and to the extent that the conclusions of law constitute findings of fact, they are adopted as such.

IT IS SO ORDERED.

DATED: June 22, 2011          By _____
                                 CONSUELO B. MARSHALL
                                 UNITED STATES DISTRICT JUDGE